Yes, Your Honor. May it please the court. My name is Mark Rappel, and I represent two of the appellants in this matter, Allen Peithman, Jr. and AEP Properties. I'm joined by co-counsel Bob Krieger, who's going to be representing a co-defendant in this matter, Sharon Elder. The present case is an appeal from the United States District Court for the District of Nebraska. It involved an extremely complicated case, an extremely complicated indictment, which included 14 separate counts. Four co-defendants. There were forfeiture allegations. There were money judgment issues. This was a 21-day jury trial. It also involved a motion for new trial. Parties have submitted lengthy briefs in this matter, including myself. I'm going to try to focus on a couple issues that I believe to be the more important issues in this particular appeal. I think the brief speaks for itself on the others. If the court wants to steer me in another direction, I'd be glad to do that. It's my understanding Mr. Krieger's going to have five minutes, and he's going to touch on some of the sentencing issues here. So the first issue I'd like to bring or like to argue to the court is the appellant's position that the lower court did err in denying Mr. Peithman's motion for a new trial. Now the Federal Rules of Criminal Procedure, Rule 33, does allow for the court to vacate any judgment and grant a new trial if the interest of justice so requires. Appellate courts can reverse a district court ruling for new trial if there's a clear and manifest abuse of discretion. And we can see that motions for new trial, as the case law suggests in our circuit, is a very unusual remedy to grant a motion for new trial. And it must, according to the cases citing Rule 33, Rule 33 must be used sparingly and with caution. And the court may grant a new trial only if the evidence weighs so heavily against the verdict that a miscarriage of justice may have occurred. Now in this particular case, there's little doubt that an error did occur at the jury trial. In fact, the district judge conceded as much. He admitted that it was clear error for the jury to be able to hear evidence as to count 14, which was a superficial error. Does the record reflect, I didn't get it from the briefs, does the record reflect how this was discovered? Because it goes through the whole trial. Right, Your Honor. It's not real clear how it was discovered. It's my understanding in the record that it wasn't discovered until much after the verdict was reached through the pre-sentence investigation process. Okay, the record doesn't show how it was discovered. Go ahead. And the district court did bring it to everybody's attention and asked them to brief it and argue it. The answer is no, the record doesn't show. Go ahead. Okay, yes, Your Honor. Thank you. And so in this case, there's clearly an error, and the error was that the jury was allowed to hear evidence of the fact that Mr. Pythman was on supervisor lease for another criminal violation. And that, come to find out, should not have ever made its way in front of the jury. The court admitted it was an error. However, the court concluded that Mr. Pythman was not prejudiced by that error. In other words, it was a harmless error. But the case law seems to suggest that the state has the burden of proving that, in fact, this error was harmless. And the case law, I'm looking at Horstman, 114 F. 3rd, 822, 8th Circuit case, says, Only if the jury may have been substantially swayed by the improperly admitted evidence must the court reverse a conviction. And on behalf of Mr. Pythman, we embrace this very high burden, this very rare circumstance in which a motion for new trial should be granted. Address the government's point that this was your whole defense from the first Miranda statement. Through trial, you would have put all this stuff on anyway because it's your defense. I'm in jail. How can I be running this business? Well, Your Honor, it's our position that, first off, the United States is the one who injected this issue into the trial from the onset of the trial. In opening statements, the prosecutor for the United States mentioned the fact that Mr. Pythman was on supervisor lease. And there'd be evidence. And they walked the jury through what would be presented. So in some respects, it's appellant's position that this defense was forced upon them. They really had no choice but to embrace this defense because it was injected into the trial by the state. I'm right that it is Miranda's statement he mentioned it. He does mention it in the Miranda statement. And has a defense-ish sort of point. Yes, Judge. Exculpatory-ish point. Yeah, exculpatory. Yeah, it was an attempt to, which arguably is hearsay, I would argue, that the defense attempt to exculpate himself is hearsay. But regardless, Judge, I believe that the defense would have been entitled to file a motion in limini to prohibit or redact that portion of the interview. The relevance of him being on supervisor lease is very, very minimal when compared to the substantial unfair prejudice that would have resulted had it occurred. But I think what makes this case so rare and why this is a rare and exceptional case that would justify a new trial is, again, this evidence was admitted by the state's case in chief. The evidence was, essentially the evidence was presented at trial as a crime and it really wasn't a crime at all. Well, isn't that something that should have been picked up long before we got to the jury trial? I mean, shouldn't somebody have read the indictment, looked at the elements and said, is this a crime? Looked in the pattern jury instructions, see there's no place where there's any jury instructions for this. And even beyond that, I mean, you get to the point, you look at it, it's like, well, what crime is that? I mean, I've been sitting around as a judge for 30 years, I guess only 27, and it struck me when I first read the indictment, I said, what is that? And so it's missed, okay? But when you were asked about what would you have offered up as your defense by Judge Cuff, there was no response. The response was, well, our defense always would have, well, what was left on the table was Cuff's reasonable conclusion that the defense always would have been, I couldn't have done it because I was in custody. And in fact, that is a defense that is offered more than occasionally. Sure. Yes, Your Honor, and for the record, I wasn't trial counsel. And when I read it, I was a little surprised that this slid past everybody as well. I think there's plenty of blame to go around as to how it ended up this way. But my response to that would be that Mr. Peitman has a constitutional right to present a defense, and that defense should be his choice, not the government's choice or the court's choice. It may not have been the strongest defense, but it could be his defense. In criminal cases, of course, the burdens of proof and the high standard of proof beyond reason without are things that defendants argue every day in courtrooms in front of juries. Reasonable doubt, reasonable doubt, burden of proof. His defense could have been, where was he? We don't know. There's no evidence of where he was, and so his fingers aren't all over this case. But again, the fact is it was a 21-day jury trial. Nobody noticed it until after the fact. The jury returns a verdict on a crime that wasn't really a crime. The detail at which it came in was also concerning to me, Your Honors. Again, this wasn't a situation where it was just merely mentioned that Mr. Peitman was on supervised release. There was actually a supervised release officer testifying, giving live testimony in front of the jury. There was extrinsic evidence introduced. I believe it was Exhibit 62, which was the supervised release report, which showed that Mr. Peitman was essentially a convicted federal felon, that he was on three years of supervised release. All this allowed for an extremely negative inference of the jury upon Mr. Peitman. Again, I believe the jury— He testified. Pardon my ignorance. Did he testify? He didn't testify at the trial, Your Honor. He testified at the money judgment phase after conviction. So he testified more to whether or not the judgment should be imposed. But what's so concerning about this case is the errors that were made allowed for the possibility of essentially for propensity evidence. And courts throughout this country's history have always been concerned about the danger of propensity evidence. A jury inferring that a defendant did it once, he'll do it again. And to allow this in, to let someone—and again, the probation officer testified, not only does she work with offenders, she works with, quote, high-risk offenders. So this jury got to hear live testimony. They saw an exhibit that characterized Mr. Peitman as a prior convicted felon who was a high-risk offender, who was on supervised release when he allegedly committed these additional crimes. And what's concerning about that is it allowed the jury to infer that he was so disrespected and such a bad person that he had the audacity to commit another crime while on supervised release. What about the government's argument essentially that the fact of the previous conviction and supervision would have come in as res geste for Mrs. Elders in any event, that in order to explain how she came to be involved in this business, that you had to explain your client's former involvement and his now lack of presence in that business? I guess my response to that, Your Honor, would be every jury trial is a balancing act between prejudicial evidence and relevant evidence. And there are certain ways to handle those situations in a much less prejudicial way than was handled in this case. There are limiting instructions that could be given. There are specific jury instructions, and the court can instruct the jury before the evidence comes in orally. This is admissible for a very limited purpose. All of this evidence came in without any sort of safeguards. It was allowed in without an instruction orally or any sort of limiting instruction. So whether it be 404 evidence or even it's my position that this is almost allowing them to impeach Mr. Pythman with his prior criminal record to a certain extent without him testifying. And as a defense attorney, that's a strategy the defendant should be allowed to make. I'll put my client on the stand. If I do so, I do it at my peril to open the door to his possible criminal record. The state was allowed to do that in this case without the defendant putting their witness, their client on the stand. And I may be confusing this with other cases because I read a lot of jury instructions and briefs. But it seems to me that the only reference at all about your defendant being charged with only the crimes charged in the indictment, of course, is just the only crimes, only on trial for crimes charged, sort of boilerplate language. But there's never any other limiting instruction on any other information that's ever given by Judge Cuff. Not to my knowledge, Your Honor. Absolutely not. And that was part of the concern here is that the jury, the dangers of them being able to infer propensity, I think, is the real concern that we have. And that's why we believe, although, again, we concede that this is a rare case, that new trials are very rarely granted, exceptional cases. I think this is an exceptionally rare case where you have a 21-day jury trial, this evidence comes in, no one catches it, and it's this damaging of evidence. And I would say, look, if this case were, if there were different facts, perhaps there would be a different outcome. Look, this was a case that was largely based, as far as Mr. Pithman's guilt, upon circumstantial evidence. There was not a lot of direct evidence linking him to these particular crimes. This is not a case where you had a full confession by Mr. Pithman, or you had a situation where there's a crime where there's a bunch of forensic evidence linking him to the crime, DNA, fingerprints, or something along those lines. But wasn't it a major part of Pithman's defense that he wasn't part of the business because he was on supervised release? It ultimately ended up being a major part of his defense, Your Honor. I would concede that. But it's our position that he was enforced to embrace that defense because the state, in their opening statements and in their case in chief, essentially brought that issue in front of the jury. And they're presenting live testimony from supervised release officers about his prior conviction, essentially. And then he had no choice but to embrace it when it came to this trial. And I think what's key is, again, this was brought up in the state's opening statements. It was not brought up, the defense did not open the door to this particular issue. They had to respond to it because that door was kicked open by the government. Well, the door is kicked open because it's a count in the indictment, right? Right. And if someone's going to give a roadmap of where we're going in the opening statement, they might very well be expected to go through the charges. And really, the problem here is just that it was missed from the very beginning. And the question is, does that taint the whole process such that you can't get to a fair trial? It's our position that it does taint the process. We cannot be confident that the jury's ultimate verdicts in this case against Mr. Python were not influenced by this extremely prejudicial evidence. And I see I have some time left. Your time is reserved. Thank you, Your Honors. Mr. Krieger. Good morning. May it please the Court. My name is Bob Krieger. I represent Sharon Elder. At the time of the alleged offense, she was in her mid to late 60s, took over her son's business after he was incarcerated, was not particularly sophisticated. But these were head shops, and these head shops sold drug paraphernalia and things that I'm old enough to remember when they first became an issue. So I'm really not here to talk about head shops. I'm here to talk about the controversy that developed during her tenure over potpourri and spice. And that's important because the record evidence at least attempted in some part to say, look, I don't know what's legal or illegal, so I'm going to ask. I'm going to work with law enforcement, and law enforcement is going to be involved in telling me what I can and can't sell. Because really, you know from other cases that the marketers of these potpourri, spice, synthetic marijuana substances keep one step ahead of the law in terms of outlawing it. And as the record in this case indicated, of the product seized, only a small portion of it was actually discovered to be controlled ones, controlled substances. So if you're Sharon Elder and you're in this marketplace and you're taking over as caretaker for your son, it seems reasonable to work with law enforcement. And she did, and the evidence in the case of the trial suggests and corroborates that. What she tried to do or her lawyer tried to do at the time was to elevate that to a jury instruction defense of public authority or entrapment by estoppel. And prior to the trial, filed a notice and made an offer of proof that wasn't the greatest. It laid out dealings with the city attorney's office, dealings with law enforcement along the way. How many letters were there? There are letters from the city attorney. Yes, there was one. I thought there was more than one, but did you say just one really? Well, I think there was one that was relevant to the discussion, and it was done in an offer of proof fashion. I don't think there were, there was trial. But long and the short of it is the judge said that, look, no rational juror could buy this defense, sustained a motion in limine, and it kind of died on the vine. I can't find anywhere in the record where counsel continued to pursue it other than the admonition, don't do this without approaching me first, which is the typical way of handling that. So that issue sort of died. But we do note that she was acquitted of the offense of selling controlled substances, which even without that part of it, the jury was unpersuaded that the government met its burden on that issue. So the question then remains, would that defense have affected or could that defense have been applied to the other charges, the misbranded drugs and all that? I think it should have. It should have been permitted. But even if it was, the city attorney, what authority do they have to make such an offer under the law of Nebraska? I mean, can the city attorney prosecute felonies? Do they have the authority, and certainly they don't have the authority to prosecute federal crimes. I agree. And so the question becomes is, would a reasonable person believe that the city attorney was empowered to bind the city, the state, and the federal government? Actually, Your Honor, I don't know if there's a federal authority that actually can bind anybody. The question is, does a person who thinks that's the case use that, maybe not public authority as an absolute defense, but estoppel, entrapment by estoppel, thinking that the people that matter that are enforcing the law are saying that it's okay? I imagine if she had a letter from I guess whoever the attorney general is that says this is okay, that might not be acceptable. So I really, in this case, all she was saying is I want to give my defense a chance. But what happens is in the long run, there are some residual sentencing issues. My five minutes is quickly evaporating with the questions. So let me just make the one argument that I think is worth noting. This acquitted conduct issue is a growing issue. I watched Judge Kavanaugh's hearings, and I blogged just last night where the blogosphere is on this question of whether there are now four votes in the Supreme Court to take cert on a case involving acquitted conduct. And I can't think of a case more interesting because in this case, it wasn't just acquitted conduct that was used to aggravate a sentencing factor. This case acts as if she was convicted of the conspiracy to distribute a controlled substance when that was the one thing that the jury said didn't happen. And every sentencing element, the money laundering, the adulterated drug, is all based upon the drug tables, not the base offense levels for those offenses. And the two offenses have 36-month maximum sentences. So if there's ever a case in which fundamental fairness says you should not be sentenced for things that you were acquitted of doing, this is it. It's a sleeper issue in this case. I know this court's position is with the majority of circuits, but that may change. And I ask you to look at it again. Thank you. Thank you for your argument. You preserve the point. Ms. Fullerton, we'll hear from you. Good morning. I'm Sarah Fullerton. I'm an assistant United States attorney with the District of Nebraska in the Lincoln office. And I was trial counsel in this case. And I think I'll maybe work backwards here. Starting with Mr. Krieger's last point about the sentencing, Judge Kuff did what he was supposed to do. He was required to consider the applicable guidelines. He did that. The applicable guidelines referred him to the drug quantity tables as far as the conspiracy to distribute paraphernalia was concerned. He considered those guidelines. And he determined on his own that the THC guidelines, the 1 to 67 ratio, was too high. And he granted departures downward to both defendants based on that. So I don't see anything that Judge Kuff did that could be considered error in terms of that sentencing determination. With respect to this public authority entrapment by estoppel defense, Ms. Elder got these letters after the officers had searched Island Smokes and seized all of her potpourri and all of her drug paraphernalia. So it was basically an after-the-fact thing saying, the letters said, there were two letters. They were identical. One went to Dirt Cheap. One went to Island Smokes, both addressed to her. And both of them said basically, don't do this anymore. And if you don't do this anymore, we won't go after you for a public nuisance. And the agreements that she signed, which didn't happen until I think June of 2015, well after the April search, basically said there were no representations being made about whether or not selling any of these would violate any state, local, or federal law. So all the city attorney's office promised her was that if she signed the agreement and she agreed not to sell these things anymore, they wouldn't go after her for a public nuisance. It was made clear in the agreements that she could still be prosecuted criminally if these items turned out to be controlled substances. And, in fact, the agreement specifically said they might be controlled substances. So the public authority and entrapment by estoppel defense went nowhere because there was nowhere for it to go. She made no proof of any kind that would have justified the court giving an instruction along those lines. So then I would go on to this issue about the motion for new trial. This defense of, I was in prison, I was in unsupervised release, I wasn't doing this because of those things, started way before my opening statement. Started when Pithman and Elder were arrested. They both gave fairly long videotaped Miranda statements. And both of them told Investigator Vincic, Special Agent Vincic, about this was their arrangement. Did you show those at trial, those videotapes, or part of them? Yes, part of them. We had redacted out at Judge Koepp's request, we requested, we redacted out any mention of what the conviction was for. So he said he had been in prison, but there was no mention in front of the jury either in those tapes or in the exhibit that Mr. Rappel talked about in terms of the supervised release. There was no mention of what that conviction was for. Does the record reflect how this error was discovered? Not really. Is there a motion, a conference about it? When was it first brought up, the first time? It was first found, I think Judge Koepp found it after the trial had been completed. And he entered an order requiring both sides to brief the issue, basically saying, I don't think this is, in reviewing, I don't think this is a law, but I want to hear from both sides. And then that's when we went forward with that. That brings me just back to a couple of things. It looks like Judge Koepp is the person who discovers that this is improvidently indicted. Judge Koepp is the person who just orders that portions of the Miranda statements be redacted. Were there any motions for any of this at all? I mean, it strikes me as unusual that there's not a more aggressive defense being offered and instead the judge is kind of acting on his own. I don't think that's, I understand what you're saying. I don't think that, in my memory, that's entirely accurate as to how things went. I think that there may not have been formal motions with respect to some of that. But I think those were things, if I'm remembering correctly, that we discussed in pretrial conferences. That could be. I didn't go through and read all the records, the transcripts. I think it may not be, there may not be a motion saying I want these things out and arguments about both sides. I think those were things that we discussed during our pretrial conferences. Were those on the record? Was a record made of that, the pretrial conference? I don't know the answer to that. Thank you. But in any event, I do recall there being discussions about those matters. And basically the parties kind of coming to an agreement in terms of these are the things that should be taken out. Because since those were videotapes, that was going to require some time in order to get that done and get the redacted copies available to everybody so they could review them. So this was not something that happened on spur of the moment. And certainly that's fairly common. Lawyers sit down, they talk, and they agree to certain redactions. And they inform the judge, we intend to redact the following. And I find that unusual at all. And so the fact that there's no record doesn't necessarily mean much. But I was just curious. And your recollection was that there were, in fact, discussions and that there was the ordinary kind of give and take between counsel. Right. Because, I mean, I would have expected that if he had ordered me to redact something and I didn't think that that was appropriate, I would have filed something. So, I mean, as far as I can recall, we had discussions since we knew this was going to be a long trial. We knew it was going to take time. That these things were reviewed by the court and both counsel and we had some discussions and the redactions were made as a result of that. Do you find an Eighth Circuit case like this? No. Did you check other circuits or even state courts for something like this where it goes all the way through and convicted of something that's not a crime? I confess no. I have not found anything directly on point. But the issue, I think, here is less. I mean, we all agree that it was an error. It was a mistake. The question is, was Mr. Pythman prejudiced by it? And the answer to that is no. Because Mr. Pythman, long before all this happens, before any of this comes up, starts down this road where this is his defense. His defense is that he was in prison. He was on supervisory release. He used to run this bad dirt cheap place. But since he didn't want to get in trouble with his probation officer, in fact, he mentioned his probation officer by name to Special Agent Vincic during that recorded interview. He said, I'm supposed to meet with Met Gallagher today. Could you please, I mean, says words to the effect of, could you please talk to her and tell her that I didn't just skip our appointment? So he's starting this from the get-go. It's almost the first thing out of his mouth is, I'm on supervisory release. I don't have anything to do with this anymore. I gave this to my mom. She's running it. And then he goes into later, he gets more comfortable with the agent and starts telling him, look, she's running it for me, essentially the idea being that once he was off supervisory release, he was going to take it back over again and she was going to retire. Did you put into evidence his supervised release order? Part of it. Okay. And what part of it and why? I put it, I think we put in the order that. As part of your case in chief. As part of our case in chief. Basically said what the terms of his supervised release were. Did not say what the conviction was for. It shows the top of it. It's in the record, right? It's in the record. It's an exhibit in the record. It looks official, right? Across the top. Yeah. Yes. Right. Yes. What about the, Mr. Rappel's argument that if you, if this had not been improvidently indicted or had been caught earlier, there would have been all sorts of limiting instructions and that even if the same evidence had come in, it would have come in with the judge saying to the jury, you know, sort of big stop sign saying, understand, he's not charged with crimes that may have been committed in the past or somewhere else. He's only charged with the crime set forth in the indictment. Well, if you look at the transcript of the hearing on the motion for new trial, the answer to that clearly from Judge Cuff's perspective was clearly no. It would not have made a difference at all. He pointed to the Miranda statements that they both gave before they had a chance to decide what else they were going to do in terms of the fact that this was the story they were telling. Mom's doing this for son. She's running his business for son so he doesn't get in trouble with his supervised release officer. That was their joint defense strategy. And I suspect part of that also had to do with mother was an elderly woman and they thought, well, if anybody gets convicted, we'll make it be her. She's a poor old lady. They're not going to give her a sentence. She's going to get off with probation and we're all going to go along with our merry business. That's what their joint defense strategy was. And that began at the time, well, it began before, but it was first stated at the time they make their Miranda statements right after they get arrested. So there was no way they could be, Mr. Peisman could be prejudiced by what was going to be his own defense. And it was probably his best defense. Hey, I washed my hands of this. I can't be involved with it. My probation officer told me I can't be involved with it. And so that's the reason that mom did it. That was their joint defense strategy. He wasn't prejudiced by that information. It would have come in for two reasons. It would have come in as part of the Miranda interviews. And Judge Kuff was quite clear that he found that those statements, those statements about the fact that he was having his mother run it while he was on supervised release, the fact he was going to take it back over from her when he was done, the fact that he was doing this to stay good with his probation officer, all of those things would have come in along with his statements that he was telling her how to run the business while he was in prison. He talked about phone calls he made to her, telling her how to check out suppliers, telling her how to go about various things, telling her how to run the business. He's telling her how to run this conspiracy from prison. So this whole scenario was going to come in anyway. It was evidence of the conspiracy. It was evidence of his part in the conspiracy. And so those statements would have come in. And Judge Kuff said, and I think was right, would not have had that information redacted out because it was relevant evidence to the conspiracy charge. Back to the record. Sure. If you look at the record, is there any time in the record the defendant indicates what the defense is going to be at trial? I would say no. Thank you. Excuse me. Okay. He did not, as far as I remember, not specifically. Did he give notice? Did she? I'm sorry, this is, of course, Elder's point. Did she give notice of a public authority? I think notice is required on that, isn't it? She did. She did. Yes, well before trial, and that's when we had hearings on that. So they did give notice of some defenses, but not anything like this? No, that's correct. It's not required. Go ahead. And the other reason I think that this evidence would have come in was because, again, this was the defense he was going to use because it probably was his best defense. It was, hey, don't look at me. I can't be involved in this stuff. I was just trying to stay clean. I can't be responsible for what my mom did. And so I think that this testimony was going to come in, the evidence was going to come in. He called a number of witnesses, or between the two of them, they called a number of witnesses who were clerks at the various stores. And those clerks came in and testified that Mr. Pithman, they only saw occasionally, once in a while maybe he'd come in and pick something up, but that, oh, Mrs. Elder, she was the one who was running it. She owned it. He just stopped in from time to time. One of them said he brought them cheesecake and bacon. Did the clerks say he was in jail? Yes. I think the clerks did, at least one of them did mention something about Indirect examination. Indirect examination about By the defense, not by you. Go ahead. Right, about what had happened after A.J. got out of jail. So, yes, they brought it in. And they would have brought it in. And if there are no other questions? Seeing none, thank you for your argument. I ask you to affirm Judge Kupf in all respects. Thank you. Thank you for your argument. Mr. Rappel? Your Honor, from a pure public policy standpoint, it would be completely improper to create a precedent where a defendant must be strapped with a defense that they introduced during a law enforcement interrogation without counsel. Defendants are constantly in law enforcement interviews trying to come up with reasons for their conduct. But to suggest that now the defendant at trial must be strapped with that defense come hell or high water would just be completely improper. And with all due respect, for the state to suggest what Mr. Pithman's best defense is is just completely inappropriate. The best defense for Mr. Pithman is the one Mr. Pithman thinks is the best defense after consulting with his attorney. So just because Mr. Pithman in an interrogation room thought that this was the best defense after consulting with an attorney, which he certainly has a constitutional right to do when he's facing criminal charges, the attorney may, after strategizing, come up with a different theory as to what the best defense is. So it's a bit concerning that the state's trying to, again, straddle the defense with a defense that was made during a law enforcement interview. And another problem I have with the United States' argument in this case is not all explanations and justifications that occur in an interrogation room with a law enforcement officer and a defendant are the same. They're not all the same. Some are alibi defenses, some are flat-out denials, some are this or some are that. But this case is particularly concerning because this explanation and this justification introduced into a trial by the state at trial, criminal conduct of the offender, criminal conduct of the defendant. The state wants to suggest that the defense wanted to introduce evidence that the mom was running the show for the son, that the elder was running it for Pythman, and that she's older than him. She'll get treated more favorably. The state could have introduced all that evidence that I just mentioned, she was running it for him and she was older, without introducing the fact that he had essentially a criminal record and a document, Exhibit No. 62. So, again, I think you just can't look at this as a situation where all explanations are the same. And lastly, I would ask the court to consider, again, there was an error made but the burden is on the state now to prove that the jury was not substantially swayed by this improperly evidence. And the state, other than speculating, cannot meet the burden that the jury in this particular case was not substantially weighed by the improperly admitted evidence. So we'd ask the court to grant a new trial in this case. Thank you. Thank you, counsel, for your argument. The cases 17-2721, 2722, 2723, and 2768 are submitted for decision by this court.